IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:08-CV-151-D

| | |
|---|---|
| LINDA B. YORK, | ) |
| Plaintiff/Claimant, | ) |
| v. | ) **MEMORANDUM AND RECOMMENDATION** |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

This matter is before the court on the parties' cross-motions for judgment on the pleadings. Claimant Linda B. York seeks judicial review of the Commissioner's denial of her application for Supplemental Security Income and Disability Insurance Benefits. After a thorough review of the record and consideration of the briefs submitted by counsel, it is recommended that Claimant's Motion for Judgment on the Pleadings [DE-14] be denied and Defendant's Motion for Judgment on the Pleadings [DE-16] be granted.

## STATEMENT OF THE CASE

Claimant filed an application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) on March 2, 2004. (R. 69-71.) Claimant alleges that she became unable to work on December 31, 1998. (R. 69.) Her asserted conditions included spurs in her neck, back, knees, and feet; osteoarthritis; a deteriorating disc in her back; atrial fibrillation; and a leaky heart valve. (See R. 85.) Claimant explained that she stopped working on the alleged onset date in order "to care for [her] disabled spouse," but she also asserts that her conditions prevented her from working after that date. (Id.) Before she

stopped working, Claimant was employed at a supermarket. Though her job title was "Cashier," she performed additional duties not traditionally associated with the work of a cashier, such as stocking groceries (lifting boxes weighing 10-20 pounds), sweeping and mopping. (R. 86.)

The Commissioner denied Claimant's applications initially and on reconsideration. Thereafter, Claimant timely requested a hearing and appeared before an Administrative Law Judge ("ALJ") on October 21, 2005. (See R. 443-66.) An unfavorable decision was rendered, but following Claimant's appeal, the Appeals Council remanded the case due to a faulty hearing recording. (R. 359-61.) A new hearing was held before a different ALJ on December 1, 2006. (See R. 467-500.) The ALJ rendered an unfavorable decision on February 23, 2007. (R. 20-31.) The Appeals Council denied Claimant's request for review by letter dated August 12, 2008, rendering the ALJ's decision a "final decision" for purposes of judicial review. See Walls v. Barnhart, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal). Claimant timely commenced the instant action pursuant to 42 U.S.C. § 405(g).

## STANDARD OF REVIEW AND SOCIAL SECURITY FRAMEWORK

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through application of the correct legal standards. See Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a

2

mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. See Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. See Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. See 20 C.F.R. §§ 404.1520 and 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the ALJ determines whether the claimant has a severe impairment or combination of impairments which significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled per se.

If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity ("RFC") is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five the burden shifts to the

3

Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry its burden through the testimony of a vocational expert ("VE"), who testifies as to jobs available in the economy based on the characteristics of the claimant.

In this case, Claimant alleges that the ALJ erred in his decision by: (1) inaccurately evaluating the medical evidence and determining Claimant's RFC; (2) improperly analyzing Claimant's allegations of pain and the combination of impairments presented; and, (3) rendering a decision unsupported by substantial evidence.[1]

## **FACTUAL HISTORY**

### I.   The ALJ's Findings

In making the decision in this case, the ALJ proceeded through the five-step sequential evaluation process set forth in 20 C.F.R. §§ 404.1520 and 416.920. The ALJ first found that Claimant had not engaged in substantial gainful activity at any time relevant to the decision. (R. 25.) At step two, the ALJ determined that Claimant suffered from four "severe" impairments--obesity, cardiomyopathy (atrial fibrillation), a knee injury, and degenerative disc disease of the lumbar spine. (Id.) See 20 C.F.R. §§ 404.1520(c). At step three, the ALJ determined that Claimant's impairments did not, alone or in combination, meet or medically equal one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 25-27.)

---

[1] Defendant correctly notes that the first and third arguments presented in Claimant's brief ("Medical evidence was improperly evaluated" and "The [RFC] assessment . . . does not take into account all the evidence, and mischaracterizes the evidence . . . .") are one and the same. (See Claimant's Br. 3-8, 10-11.) The court evaluates them together as Claimant's first argument.

4

The ALJ next determined Claimant's RFC by considering all of her subjective complaints and reviewing the medical evidence. The ALJ found that Claimant retained the RFC to sit, stand, and walk six hours during an eight-hour workday with a sit/stand option, and to lift and carry 20 pounds occasionally and 10 pounds frequently, but that she could not perform frequent postural activities and would need access to a restroom. (R. 27-28.) Therefore, the ALJ found, Claimant could perform a wide range of light work. (R. 28.)

At step four, the ALJ found that Claimant was not capable of performing her past relevant work as a cashier. (R. 29.) See 20 C.F.R. §§ 404.1565 and 416.965. Nevertheless, at step five, the ALJ determined, based on the testimony of the VE and considering Claimant's age, education, work experience, and RFC, that Claimant was capable of making a successful adjustment to other work then existing in significant numbers in the national economy. (R. 29-30.) As a result, the ALJ found that Claimant was not under a "disability," as defined in the Social Security Act, at any time relevant to the decision. (R. 30.)

## II.     The Administrative Hearing

### A.     Claimant's Testimony at the Administrative Hearing

Claimant testified at her administrative hearing. (R. 471-90.) The ALJ's questions and Claimant's testimony focused on the time period prior to her date last insured, September 30, 2002, because, as the ALJ noted at the hearing's outset, Claimant needed to demonstrate that she was disabled prior to that date to succeed in her claim for benefits. (See R. 470.)

Claimant was 54 years old on the date of the hearing. (R. 472.) She lived alone. Her husband passed away approximately two months before the hearing. Claimant

5

finished high school. (Id.) Prior to the alleged disability onset date, Claimant worked as a cashier and stocked shelves at a supermarket, sometimes lifting between five and fifteen pounds. (R. 473-74.) Before that, Claimant did similar work at a number of convenience stores, cashiering, stocking shelves and coolers, sweeping and mopping. (R. 474.)

Claimant testified that prior to September 30, 2002, she had atrial fibrillation, an abnormal heart murmur, and a leaky heart valve for which she took medication. (R. 477.) Either her heart condition or the medications (Ultracet for pain and Skelaxin, a muscle relaxer) made her sleepy and short of breath, preventing her from working. (R. 478, 489.) Claimant recounted one episode where she was hospitalized for ten days after visiting Urgent Care with shortness of breath and undergoing an EKG that revealed a significantly elevated heart rate. (R. 488-89.)

Claimant also had back and knee problems for which she took medications. (R. 478-79.) Claimant opted not to have surgery to address her back problems due to concerns she had about potential negative effects of surgery. (R. 478.) To address her knee problems, Claimant walked with a cane she purchased at a drug store. (R. 479.) Claimant also testified that she experienced neck spurs or bulges and swelling in her hands, feet, and legs, and that she took pills every day to keep fluid from building up in her body. (R. 480, 484-85.) Claimant had difficulty sleeping for which she occasionally took Tylenol PM or a similar medication. (R. 485-86.) Even so, Claimant was up several times a night to switch her body position or use the bathroom. (R. 486.)

Claimant testified that the pain she experienced all over her body was "like a nagging toothache," constant but fluctuating in intensity from 6 out of 10 up to 9 or 10. (R. 480-81.) To alleviate the pain, Claimant took medication and spent five or six hours

6

lying down each day. (R. 481.) She often propped her feet up to reduce the swelling in her hands, feet, and legs. (R. 486.) She could only walk ten to twenty feet before she had to stop because of the pain. (R. 481.) She could stand for five to ten minutes and sit for 30-45 minutes before needing to move around. (R. 482.) Claimant explained that her doctors told her not to lift more than 15 pounds because of her heart condition. (Id.) Claimant estimated that she could only have lifted about 5 pounds without making her problems worse. (R. 483.)

Claimant also testified about her daily activities prior to her date last insured. (R. 472, 483-84). She cooked on occasion and did "very little shopping," going straight to the store, picking up the items she needed, and returning home. (R. 483.) Claimant did the laundry and cleaned as she was able. For example, she testified that she would sweep, but only while taking frequent breaks. (Id.) Claimant drove a car two or three times per week. (R. 472.) She went to church once in awhile but otherwise did not engage in activities outside the home. (R. 483-84.)

### B. Medical Expert Testimony

Dr. Helen Cannon testified as a medical expert at Claimant's hearing. (R. 491-96.) Dr. Cannon indicated that Claimant's primary medical issue during the time period in question was her cardiac condition. (R. 491-92.) However, Dr. Cannon opined that the medical records indicated that Claimant recovered very well from a cardiac standpoint after first presenting in August 1999 with atrial fibrillation, cardiomyopathy, congestive heart failure, and hypertension. (Id.) Dr. Cannon testified that Claimant did not meet or medically equal a Listing. She further testified that Claimant could do at least light work

7

with a sit-stand option, assuming she was not required to continuously bend or stoop, and further assuming she had access to a restroom. (R. 493-96.)

    **C.**    **Vocational Expert Testimony**

Julie Sawyer-Little testified as a vocational expert ("VE") at Claimant's hearing. (R. 496-98.) She reviewed Claimant's past work and then responded to two hypothetical questions posed by the ALJ. First, the ALJ asked her to assume a hypothetical individual sharing Claimant's age, education, and work history, who was limited to light work and who would need to alternate frequently between sitting and standing, avoid postural activities such as stooping or squatting, and have access to a restroom. (R. 497.) Ms. Sawyer-Little testified that such an individual could find work, in the state or national economies, as a photocopy machine operator, office helper, or mail sorter. (Id.) The ALJ then asked her to assume the same individual with the additional limitations described by Claimant in her hearing testimony, specifically that she was unable to lift more than five pounds, the difficulties she described with standing and walking, and the effects she claimed her medications had on her. Ms. Sawyer-Little indicated there were no full-time jobs in the state or national economies that such an individual could perform. (R. 498.)

**III.**    **Claimant's Arguments**

    **A.**    **The ALJ did not err in evaluating the medical evidence and determining Claimant's RFC**

Claimant asserts that the ALJ erred in evaluating the medical evidence, and in particular the opinions of several of her treating physicians. Claimant contends that she suffered from atrial fibrillation, along with other impairments, and points to evidence in the record that supports a finding of such impairments. As the ALJ recognized, and the record

8

reflects, Claimant suffers from the severe impairments of obesity, cardiomyopathy, a knee injury, and degenerative disc disease of the lumbar spine. (R. 25.) Nonetheless, the ALJ concluded that Claimant's impairments do not meet or equal a Listing.

First, Claimant must show that she was disabled before the date last insured, or September 30, 2002. Woolridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987). Although Claimant provides a detailed account of her medical problems, and specifically her hear-related issues, (See Claimant's Br. 5-6.), she does not refute the fact that, as defendant points out, neither of plaintiff's experiences with atrial fibrillation that occurred before September 30, 2002, lasted a year. Under the applicable regulations, in order to meet the "duration requirement" for a finding of disability, a claimant must show that an impairment lasted at least twelve months. 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted our must be expected to last for a continuous period for at least 12 months).

Claimant's first episode with atrial fibrillation occurred in late August 1999. (See R. 135-36.) By October 19, 1999, following cardioversion, Claimant maintained a regular heart rate and rhythm with no gallops, and a normal sinus rhythm. (R. 130.) The doctor noted that Claimant was doing well from a cardiac standpoint and that, "As far as [Claimant] knows her heart has been in rhythm the entire time since cardioversion." (R. 130.) Her doctor recommended that she undergo left heart catheterization to make sure she did not have an ischemic cardiomyopathy, and the procedure was performed in early November. (R. 129-30.) Due to his findings from the catheterization and a subsequent echocardiogram, the doctor concluded that Claimant's "artrial fibrillation has converted back to normal sinus rhythm and she has been documented to have normal left ventricular

9

systolic function." (R. 128.) Claimant's doctor suggested Claimant likely had a viral cardiomyopathy which improved on its own, and discontinued many of Claimant's medications. (R. 128-29.)

Claimant's second episode of atrial fibrillation occurred more than a year later, in February 2001. However, again, Claimant recovered from the episode in less than a year. (R. 148-50, 179-80.) In November 2001, her doctor noted that "Cardiovascular exam demonstrates regular rate and rhythm without audible murmurs, rubs or gallops," and that she seemed to be "doing well from a cardiac standpoint . . ." with "no obvious recurrences of atrial fibrillation." (R. 179).

The fact that Claimant can point to other evidence in the record that supports her claimed impairments does not diminish the ALJ's analysis. When conflicting evidence is presented, it is up to the ALJ to resolve those inconsistencies. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). It is not the province of this court to determine the weight of the evidence. Id. The ALJ correctly summarized this evidence, contrary to Claimant's argument. (See R. 26, 29; Claimant's Br. 5 (describing the ALJ's decision as having "turn[ed] the record inside out").)

Claimant also asserts that the ALJ failed to adequately consider her treating physicians opinions. (Claimant's Br. 4, 8). She points to two statements made by Dr. Kenneth Dizon, one of Claimant's treating physicians, in November 2006, more than four years after her date last insured. She highlights a letter in which Dr. Dizon stated, "[Claimant] has had chronic atrial fibrillation which was first diagnosed in 1999," and "[Claimant] underwent a DC cardioversion back in 1999 for which she was able to maintain sinus rhythm for approximately six months [before undergoing] a similar cardioversion . .

10

. in 2000 [after which] her sinus rhythm was short-lived, less than three months in duration." (R. 401.)

Under the Commissioner's regulations, controlling weight is given to the opinion of a treating source on the issues of the nature and severity of an impairment if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1995). The statements by Dr. Dizon suggest that Claimant suffered from atrial fibrillation that was not controlled within a twelve month time frame. However, these statements are not supported by the record. Indeed, while defendant aptly highlights the inconsistencies between Dr. Dizon's statements and the record evidence, Claimant fails to point the court to the primary records of the details and events to which Dr. Dizon refers (especially the duration of Claimant's sinus rhythm following Claimant's 1999 cardioversion and the supposed second cardioversion in 2000). Moreover, in Claimant's own brief, where she lists her medical history, she does not mention a cardioversion in 2000. Finally, Claimant's medical records from February 2001 provide that she had atrial fibrillation and was cardioverted "two years ago," which would have been in 1999.

For the reasons stated above, the court rejects Claimant's argument that the ALJ inaccurately evaluated the medical evidence, including the opinions of Claimant's treating physicians. The court relied on the medical evidence in the record in determining Claimant's RFC. Claimant asserts that the ALJ did not arrive at the correct RFC because

11

he overlooked some of her conditions. However, because it is the court's opinion that the ALJ correctly reviewed the medical evidence, the court also concludes that the ALJ did not err in determining Claimant's RFC. Accordingly, the court finds that the ALJ's determination of Claimant's RFC was proper, adequately explained, and supported by substantial evidence.

### B. The ALJ did not err in finding Claimant's testimony not entirely credible

Claimant contends that the ALJ impermissibly concluded that her testimony regarding the intensity, persistence and limiting effects of her symptoms and pain was not entirely credible. (See R. 28-29.)

An ALJ performs a two-step inquiry to determine whether a claimant's allegations of pain and limitations are credible. First, the ALJ must determine if there is objective medical evidence that supports the existence of a medical impairment which reasonably could be expected to cause the pain and symptoms alleged. See Hines v. Barnhart, 453 F.3d 559, 564-65 (4th Cir. 2006). In this case, the ALJ determined that Claimant suffered from impairments which could reasonably be expected to produce the alleged symptoms. (R. 29.) Next, the ALJ evaluates a claimant's statements regarding her symptoms. Craig v. Chater, 76 F.3d 585, 596-97 (4th Cir. 1996). This evaluation must take into account a claimant's subjective statements about her pain as well as all available evidence, including the claimant's medical history, medical signs, laboratory findings, objective medical evidence of pain, and other evidence that might shed light on the severity of the impairment, such as evidence of the claimant's activities of daily living, specific descriptions of the pain, and any treatment regimen. Id. at 595. Where the first step in the credibility analysis is met (as it was here), at the second step the claimant's allegations about her pain

12

"may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity." Id. However, the ALJ is not required to accept a claimant's allegations "to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause [the pain alleged]." Id.

In this case, at the second step of the analysis, the ALJ noted inconsistencies between plaintiff's testimony and the evidence in the record. (R. 28-29.) The ALJ catalogued medical evidence suggesting improvement in Claimant's cardiac condition and highlighting "mild" findings in other areas. (R. 29.) For example, the ALJ noted that in September 2001, Claimant's doctor concluded that she was doing well from a cardiac standpoint. (R. 29.) He also pointed out Claimant's hearing testimony regarding daily activities the ALJ found to be "rather extensive." (Id.) The ALJ noted that Claimant could perform cooking, shopping, and laundry, and also attend church. (Id.) The ALJ also noted that there was no indication any doctor had advised Claimant that she was unable to work during the time period at issue. (Id.)

After reviewing the ALJ's decision, the court finds that the ALJ made the necessary findings in support of his credibility determination. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (noting that an ALJ's observations regarding credibility should be given great weight). The ALJ thoroughly explained his credibility analysis and how he resolved inconsistencies in the evidence. As a result, the ALJ satisfied his duty under the applicable regulations and law and did not err in finding Claimant not entirely credible.

13

**C. The ALJ's decision was supported by substantial evidence.**

Finally, Claimant argues that the ALJ's decision was not supported by substantial evidence. However, the ALJ reviewed Claimant's medical history in detail. (R. 25-27) In addition, he performed the necessary analysis in determining Claimant's credibility. For the reasons noted in more detail above, and following a full and careful review of the ALJ's decision and the record in this matter, the court rejects Claimant's argument.

## **CONCLUSION**

Accordingly, because there is substantial evidence to support the findings of the ALJ, the court **RECOMMENDS** that Claimant's motion for judgment on the pleadings be **DENIED** and that Defendant's motion for judgment on the pleadings be **GRANTED**. The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have ten (10) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and

legal conclusions not objected to, and accepted by, the District Court.

This the 29th day of June, 2009.

_____

DAVID W. DANIEL

United States Magistrate Judge